29 C.C.P.A.(Patents)

SMITH v. SWAINE.

Patent Appeals No. 4571.

Court of Customs and Patent Appeals.

April 27, 1942.

Rehearing Denied June 12, 1942.

Mastin G. White, of Washington, D. C. (Irvin G. Menikheim, of Washington, D. C., of counsel), for appellant.

Forbes Silsby, of New York City (George B. Campbell and Benjamin Sweedler, both of New York City, of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

BLAND, Associate Judge.

Appellant has here appealed from the decision of the Board of Appeals of the United States Patent Office awarding priority of invention to appellee in the two counts of an interference relating to an invention of an insecticide. The counts are as follows:

"1. An insecticide containing as its essential active ingredient one of the class of compounds known as xanthones.

"2. An insecticide containing as its essential active ingredient xanthone."

The counts correspond to claims of Smith's application and were copied by Swaine into his application at the suggestion of the examiner. Count 1 is for one of a class of compounds known as xanthones as the essential active ingredient of the insecticide, while count 2 is specific to xanthone as the essential active ingredient. The insecticide is for use in controlling or combating insect pests. Both parties sought an insecticide that was toxic to such pests as the codling moth, but non-toxic to warm-blooded animals. Arsenate of lead had long been used as an insecticide. It poisoned fruits and vegetables and injured foliage. It seems that xanthone and certain others of its class answered the problem.

The Smith application was filed May 7, 1938, while the Swaine application was filed May 4, 1938.

Both parties took testimony. The burden was upon Smith to prove priority of the invention defined in the counts by a preponderance of the evidence. He showed various laboratory tests of the use of xanthone on a number of different pests, many of which tests resulted in failure. Before the Examiner of Interferences, Smith relied upon certain laboratory tests made with xanthone on codling moth and mosquito larvae, which tests were completed and reported prior to December 1935. This is earlier than the date of any inventive act by Swaine.

The Examiner of Interferences originally held that evidence concerning the tests on codling moth and mosquito larvae showed that Smith, through the work of Dr. David Fink, had reduced the invention to practice. Smith, at the time of taking the testimony, was a chemist employed by the Division of Insecticide Investigations in the Bureau of Entomology and Plant Quarantine of the United States Department of Agriculture. Dr. Fink testified that he "was employed in the United States Department of Agriculture Bureau of Entomology from 1912 to 1937" in the "Division of Control Insects."

Upon petition for reconsideration, the examiner's attention was called to the decision of this court in Smith v. Bousquet, 111 F.2d 157, 27 C.C.P.A., Patents, 1136, wherein this court held laboratory tests of an insecticide used on codling moth larvae were not sufficient to prove reduction to practice for the reason chiefly that the tests were not made under the natural surrounding conditions where the codling moth larvae were found so as to show what, if any, damaging effects from the insecticide might result to the foliage or parts of plants. The examiner changed or reversed his holding as to the codling moth larvae tests, but adhered to his view that the tests made by Dr. Fink in the

laboratory on mosquito larvae showed that xanthone had been proved to be useful in the destruction of mosquito larvae and that such tests amounted to a reduction to practice of the invention defined by the counts. He therefore awarded priority of the invention of both counts to Smith.

The Board of Appeals, upon appeal from the Examiner of Interferences, reversed the decision of the examiner and held that the said tests relied upon by Smith were not sufficient to prove the value of the insecticide tested. It stated that: " * * * The element of conception prior to Smith's alleged reduction to practice does not enter into the problem before us, for in Smith's brief it is admitted 'that, in case of insecticides, conception and reduction to practice go hand in hand.' "

The board did not, therefore, give Smith any date for conception and the question of diligence was not considered.

The tests relied upon, made by Dr. Fink upon mosquito larvae in September 1935, involved the use of xanthone. The xanthone was used in acetone and this compound was called a stock solution. Afterwards, various dilute solutions were made up from this stock, starting from one part to a million up to 200 parts per million. Fink testified: " * * * The mosquito larvae had previously been reared in the laboratory under natural conditions and when they had attained the fourth stage of development they were used for these tests, usually 50 larvae were counted in a 100–cc. beaker and each concentration had 10 duplicates of the beaker containing the larvae for test. All the beakers containing the larvae in the different concentrations of the compound were afterwards placed in the constant temperature water bath and left for at least 18 to 24 hours. Afterwards the percent mortality in the various concentrations were determined by counting the number of dead larvae, and the average kill obtained for each concentration used was thus determined."

From the various tests with different amounts of xanthone in stock solution, which as before stated contained acetone as a solvent, it was finally determined that from the use of xanthone in increasing amounts it would, in a concentration of 1 to 20,000 parts, result in a 100 per cent. extinction of the mosquito larvae.

During the next two or three years, the xanthone was sent to various places, especially to governmental agricultural experimental stations for tests upon other insects, such as the Japanese beetle and the corn borer.

Concerning the tests made by Fink as before stated, the Examiner of Interferences held in part as follows:

"Indeed, in many respects the mosquito larvae tests on behalf of Smith were more exacting and rigorous than would have been similar tests in outdoor ponds, etc., because substantially all other factors which might have caused the death of the larvae were eliminated. Moreover, fish or other natural enemies of mosquito larvae are not found in many natural breeding places, such as ditches, rain-water barrels, where run-off water collects. In such places, too, the only other life is usually of a low form, such as algae and various microscopic plants and animals, and any effect thereon by the insecticide is of no consequence.

"Accordingly, in view of all the facts and circumstances the laboratory mosquito larvae technique of the Department of Agriculture is deemed to establish all necessary conditions for determining the practical utility of any given material as an insecticide."

Swaine, before the board, attacked these tests as being insufficient and argued that under the Smith v. Bousquet case, supra, the mosquito tests should have been made under "outdoor conditions"; that the kind of water used was not shown and that it might have included chlorine; that the acetone itself, admittedly toxic to certain pests, was not shown by such tests not to be the cause of the claimed beneficial results; that the tests show extermination of but one of many species of mosquito larvae; that they did not show the effect xanthone would have in brackish or salt water; that appellant's conduct after said experiments were made suggests that what appellant did amounted to an abandoned experiment; and that owing to the excessive cost of the material, the laboratory tests did not show the material to be commercially practicable for mosquito larvae control in large areas.

The Board of Appeals agreed with substantially all the contentions of Swaine and in part said: " * * * The party Swaine attacks these tests on various grounds. He contends that the conditions surrounding such test must necessarily vary materially from the natural conditions under which the larvae exists in

nature. It is well known that there are a large number of different species of mosquitoes and as pointed out by appellant [Swaine], the larvae of these live and exist under quite varying conditions. Nothing is said in the proofs offered by Smith as to the water used in the tests. Appellant contends that the salinity, acidity and alkalinity are quite material. In addition it may be said that if tap water was used it might contain some chlorine which might possibly affect the larvae. Appellant also urges that acetone is known to be an insecticide, and when used as a solvent for the xanthone it might easily introduce an error into the results. The party Smith, states, however, that the quantity of acetone present was so small that it could have no detrimental effect. We, however, are not satisfied that this argument is sound. While acetone alone in the concentrations used might have no disturbing effect, still it is possible that it might introduce an error when used in combination with the xanthone."

■ We are in agreement with the decision of the examiner and in disagreement with that of the board. There is nothing in the Smith v. Bousquet case, supra, that would suggest that a test involving extermination of mosquitoes in a laboratory in water would not be satisfactory to prove reduction to practice of the involved invention merely because it was done in a laboratory. We agree with the Examiner of Interferences in this respect that a proper laboratory test on mosquito larvae extermination might satisfactorily prove the utility of the insecticide used. We do not think it necessary under such circumstances to test the insecticide on all species of mosquitoes or in all kinds of water. Water is the natural habitat of mosquito larvae, and if the water used is shown not to contain a substance that would make uncertain the effect of the essential ingredient, we think a satisfactory test could be made in a laboratory.

■ We are in disagreement with the decision of the board in holding that the tests made by Dr. Fink did not satisfactorily show the effect and usefulness of the "essential active ingredient" of the counts involved so as to amount to a reduction to practice. The uncontradicted evidence shows that acetone is toxic to mosquito larvae. The record shows that the acetone was used as a solvent for the xanthone and was effective as such. Xanthone in hard dried form must be made soluble. The Handbook of Chemistry and Physics, 21st Ed., published by the Chemical Rubber Publishing Company, states (p. 772) that xanthone is slightly soluble in hot water, ethyl ether, benzene, and ligroin, and soluble in hot alcohol. Fink states, in substance, as we construe his testimony, that in the tests relied upon he used no more acetone than was known to be non-toxic to mosquito larvae and that when he added additional amounts of xanthone to the stock solution the quantity of acetone was not increased.

Smith's argument for the sufficiency of the test may be paraphrased as follows: In one test Fink used a non-toxic amount of acetone and a certain percentage of xanthone and found it unsatisfactory. In the next tests he used the same amount of acetone wi.h increasing amounts of xanthone until he secured a composition which gave complete success in the extermination of mosquito larvae. These tests, Smith argues, show definitely that it was the xanthone which he had continued to add to the composition in successive tests that produced the result, and not the acetone.

We think Smith's contentions in this regard are sound and that the board was not justified in concluding that the use of the acetone as a solvent for the xanthone "might easily introduce an error into the result." The board did not suggest what kind of error could possibly have been introduced into the result. There is nothing in the record, although it contains considerable expert testimony, which convinces us that the presence of the acetone in a non-toxic quantity could have any influence on the xanthone other than to act as its solvent. It is possible that the acetone, to some extent, added to the toxic character of the composition, but the counts at bar are directed to an insecticide which contains xanthone as its "essential active ingredient." It seems clear to us that the Fink tests show that xanthone was the "essential active ingredient" of the insecticide which he successfully used.

Priority of the invention defined in the counts involved should have been awarded to Smith. The decision of the Board of Appeals is reversed.

Reversed.