47 CCPA

**Benjamin PHILLIPS and Paul S. Starcher**

v.

**Arthur W. CARLSON.**

**Patent Appeal No. 6511.**

United States Court of Customs
and Patent Appeals.

June 1, 1960.

Watson, Leavenworth, Kelton & Taggart, New York City, Paul A. Rose, Washington, D. C., Louis C. Smith, Donal E. McCarthy, New York City (John T. Kelton, New York City, of counsel), for appellant.

Gary, Desmond & Parker, Lee J. Gary, Chicago, Ill. (James M. Parker, Chicago, Ill., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Associate Judges, and Judge C. WILLIAM KRAFT, Jr.*

MARTIN, Judge.

This appeal is from the decision of the Patent Office Board of Patent Interferences awarding priority to the senior party, Carlson, of the single count involved in this appeal.

---

* United States District Judge for the Eastern District of Pennsylvania, designated to participate *in place of Judge* O'Connell, pursuant to provisions of Section 292(d), Title 28 U.S.C.

A patent, U.S.Patent No. 2,739,161, issued on March 20, 1956 to Carlson, the senior party, on an application filed December 16, 1954, containing a single claim, the count of this interference. It reads:

As a new composition of matter a compound of the structure

That compound has been referred to by the parties variously as bis- and di-(2, 3 epoxycyclopentyl) ether and as bis- and di-(2, 3 epoxycyclopentenyl) ether.

On July 27, 1956, Phillips and Starcher filed application Serial No. 600,386, entitled "Diepoxide," claiming the subject matter here in issue. Pursuant to their burden of proving the right to an award of priority, Phillips and Starcher took testimony. Carlson chose to rely upon his filing date.

It is unnecessary to discuss the question of whether the compound of the count was made by the junior party prior to appellee's filing date since the board's holding in that regard was unchallenged. The only viable issue in this case is whether Phillips et al. have proven a prior actual reduction to practice. Two separate and distinct reductions are relied upon by the junior party. One involves the use of a solution of the composition of the count as a systemic herbicide[1] for tomato plants; the other, the use of the substance as an ingredient of a resin.

The board held that in the absence of something to correlate systemic herbicidal activity in tomato plants with something useful, the killing of tomato plants alone is not the type of utility which satisfies the requirements of an actual reduction to practice. Appellants assert that the successful use of their compound as a systemic herbicide for a tomato plant is sufficient because that plant is a criterion for establishing the substance's systemic herbicidal effect upon plants in general. Appellee asserts that there is nothing of record to show that the experimental tests were reproducible or reliable, or that killing tomato plants has any connection whatsoever with the effect of chemicals on any other plants.

In connection with the reduction to practice of the count as a resin ingredient, the board found that this utility was adequately demonstrated. However, the junior party was held not to be entitled to an award of priority because of its failure to corroborate that use. Appellants argue that the corroboration rule should not be extended to situations in which the invention has been completed (here, when the compound was made) and it is sent to others to find a use for it. But even if corroboration be required, appellants state that there is a sufficiency of evidence upon which to predicate corroboration. Appellee disagrees with both of these contentions.

The board further held that the contention of appellee that appellants' delay in filing their application was indicative of an abandoned experiment was not warranted. Appellee has renewed the argument here.

Since there is no question but that appellants conceived the compound in late 1951 and produced it many times in early 1952, it remains for us to determine only whether their activity with respect to this compound constitutes a reduction to practice.

It is not disputed that samples of the compound were subjected to certain tests by an employee of the biological research branch of the Boyce-Thompson Institute

---

1. A systemic herbicide is a herbicide which when applied to the soil surrounding a plant enters that plant and destroys the root system.

for Plant Research, an affiliate of Union Carbide.

Those tests, made in February and March 1952, consisted of spraying a one percent solution of the compound on the foliage of bean plants, corn plants and tomato plants, and of pouring the solution on the soil surrounding several tomato plants which were planted in 4" pots. Spraying the foliage of the plants produced no ill effects with one insignificant exception. However, according to the laboratory report, the effect of watering the soil of the potted tomato plants with the solution was quite different. The report states that the two plants so treated were severely injured and that the chemical had been "translocated" from the roots up through the plants. It was also reported that the growth of one of the plants was stunted. However, the monthly report of this laboratory did not note the translocation effect.

The significance of these tests was explained by Dr. Lawrence J. King,[2] who, at the time testimony was taken, was a Senior Fellow in charge of herbicide research on a Carbide Fellowship at the Boyce-Thompson Institute. He stated that he was in charge of a program designed to find new herbicides, that at least by 1947 certain test procedures for determining the herbicidal properties of chemicals had been established, and that these procedures were followed from that time until the time of his testimony. Dr. King further stated that several thousand compounds had been tested in the same manner as the di-(2, 3-epoxycyclopentyl) ether, that other organizations had used those tests, and that "the tomato plant is a very suitable plant for the evaluation of herbicidal responses." He testified that the laboratory reports indicated to him that the applied chemical had "severe toxicity or herbicidal° activity to the plant" and "could be used as systemic herbicides."

We believe that appellants introduced sufficient evidence to show that their compound was subjected to the standardized tomato plant test, and that Dr. King was sufficiently qualified to establish that the use of tomato plants was representative for purposes of determining the herbicidal effects of compounds upon plants in general. He was also qualified to evaluate the laboratory reports. Therefore it is our opinion that appellants have proven that they successfully reduced their invention to practice by this evidence alone.

However, since we do not think that the board correctly evaluated the evidence concerning certain aspects of the testing of the compound as a resin ingredient it behooves us to discuss that matter also. In that connection the board said:

"Dr. Phillips testified he made a trip to the Bakelite Company [an affiliate of Carbide] near the end of January or the early part of February, 1952, and gave a small sample of the epoxide of the count to Dr. Ivey Allen at the Bakelite laboratory. Correspondence then ensued between Phillips and Allen (Exhibits 34, 35 and 36) which records a request by Allen for the epoxide of the count (among others) for evaluation. Records disclose shipment of one pound of the involved compound on April 9, 1952, see Exhibits 36 and 37.

"The experimental work at Bakelite was carried out by John Commerford, who testified in considerable detail. While Commerford's work has been vigorously attacked it seems to us without question that it demonstrates utility as an intermediate for epoxy resins, at the very least to the extent required in Potter v. Tone, 1911 C.D. 295, 163 O.G. 729, 36 App.D.C. 181. It is unneces-

2. Dr. King graduated from Earlham College in 1938 with a B. A. degree, received a master's degree from the University of Chicago in 1942, and a Ph.D. degree in Botany and Plant Physiology in 1952, also from the University of Chicago.

sary to dwell further on this matter since the case turns on another question, e. g. corroboration, as will next appear.

"Of the Carbide employees only Phillips testified that the materials sent to Bakelite included the compound in issue. Allen did not testify and the witnesses from Bakelite (Commerford, Schechter) had no personal knowledge of the compound. Only Commerford testified in this regard and all he knew was what he read on the label (XQ94.). It is clear that all knowledge as to the identity of the material sent to Bakelite stemmed from Phillips (a joint inventor) and none of the other witnesses to the transaction had personal knowledge in this regard.

"In the light of the facts appearing, the junior party must lose as a matter of law on the issue of corroboration. * * * "

We concur with the board's findings as to the factual situation and also with its conclusion that the tests at Bakelite established the compound "as an intermediate for epoxy resins." We disagree, however, with the board's decision with respect to its determination of the issue of corroboration. All of the circumstances surrounding this particular situation lead us to believe that there is sufficient evidence to establish corroboration as we understand that legal requirement.

There can be no question but that a compound labeled di-(2, 3-epoxycyclopentyl) ether was actually tested. Commerford of Bakelite testified that he did the testing and recorded the results, and there is much documentary evidence of the testing of the compound so labeled.

Exhibit 39, dated March 1, 1952, a handwritten report by Commerford of tests of a compound labeled di-(2, 3-epoxycyclopentyl) ether, reads in part:

"Object: To test a sample of Di-(2,3-epoxycyclopentyl) ether received from [Carbide] South Charleston as other samples were tested * * *."

A detailed report follows noting the various tests and results obtained. The exhibit shows, as substantiated by the testimony, that the reaction product of a polyamine and the di-(2,3-epoxycyclopentyl) ether was a composition which gelled in 9 minutes and 18 seconds at 160° C, the gel being soft and sticky when hot and hard and brittle when cold. Another of the tests with a different amine produced a composition which was "soft, hot; brittle, cold."

One of the weekly reports of Bakelite dated June 6, 1952 (Exhibit 38) has this to say about the compound so labeled:

"Samples of five diepoxy products obtained by the South Charleston Research Laboratories staff via peracetic acid oxidation of the corresponding dienes, were preliminarily tested as possible replacements in C-8 resin formulations for BRR-18774 (the diglycidyl ether of Bisphenol A).

\* \* \* \* \* \*

"In the reactions with polyamines, the di-(2,3-epoxycyclopentyl) ether indicated more reactivity at elevated temperatures than the other experimental samples. This compound produced a gel within $9\frac{1}{2}$ minutes at 160°C. with the polyamine (BRR-18796) at a 1.0 epoxy to 1.0 N–H ratio whereas the other compounds produced no gel within 30 minutes at 160° and the BRR-18774 gelled within 15 seconds under identical conditions. In the reactions with polyphenols, none of the experimental diepoxy compounds produced thermoset resins within 30 minutes at 160°C using either 0.4% KOH catalyst or its molar equivalent of benzyldimethylamine. Prolonged baking at 90°C and 120°C also did not produce insoluble infusible products at the 1.2 epoxy to 1.0 phenolic-OH ratio used.

"These tests merely indicate the comparative degree of reactivity of these various materials under specific test conditions. Further ex-

ploration using quantities necessary for obtaining physical data will be undertaken when additional quantities of the diepoxy materials are available."

If the compound which Commerford actually tested was that of the count, it is obvious that the requirement of corroboration to establish a reduction to practice has been fulfilled.

So the next question to be resolved is whether the tested compound was di-(2,3-epoxycyclopentyl) ether.

Dr. Ivey Allen of Bakelite sent a letter, dated March 20, 1952 (Exhibit 35) to Dr. Benjamin Phillips, the body of which reads:

"Subject: *Epoxides*

"Dear Ben:

"This is in reply to your letter of February 26. You certainly did a real job of organizing and analyzing the situation on diepoxides and we are still in the process of digesting the information. Otherwise I would have replied to it sooner. In fact the digesting process is probably going to continue for some time yet but I should not wait longer before at least acknowledging your letter.

"Our feeling here is that we should try to select a limited number of compounds for evaluation in order to get as comprehensive a view as possible of what to expect from different types of structures, and then to select the most desirable ones for more intensive study. We appreciate the limitations on your capacity to supply compounds for evaluation. If it is feasible to do so, however, we would like very much to have you supply us with a modest amount of each of the following compounds:

1. * * *
2. * * *
3. * * *
4. Di (2,3-epoxycyclopentyl) ether
5. * * *

"These compounds are all on your "A" list, and are listed here approximately in the order of their anticipated usefulness to us. We will probably have to leave it to you to determine what we mean by modest quantities. In general, a kilo would be wonderful, a half kilo would be fine, anything down to fifty grams would be useful and appreciated.

"You will no doubt be hearing again from me or others in our group on this subject. If in the meantime you are in this area again we would be very glad to have you pay us a visit."

In reply Phillips sent a letter dated April 9, 1952 (Exhibit 36) to Allen acknowledging receipt of the March 20th letter; Phillips' letter reads in part: "Dear Dr. Allen:

We are sending the following materials to you and hope that they will be of use in the epoxy resin program.

* * * * * *

Di-(2,3-epoxycyclopentyl) ether 1 pt.

An attached sheet gives physical properties and other data on these compounds.[3] * * *

On that same date, April 9, 1952, Phillips requested and approved the shipment of a pint container of di-(2,3-epoxycyclopentyl) ether to Allen of Bakelite (Exhibit 37). The compound was sent to Bakelite, not by Phillips, but by the shipping department of Union Carbide (shipping order, Exhibit 37). With ref-

---

3. Footnote ours. The attached sheet, as to di-(2,3-epoxycyclopentyl) ether states:

Boiling point 98–100°C/2 mm.

Refractive index (n $\overset{30}{\underset{D}{}}$) 1.4870

Remarks: Mixture of diastereoisomer including at least one which is a solid at room temperature. Insoluble in water.

erence to Exhibit 37, Phillips testified as follows:

"Q84. You referred to a shipping order, Dr. Phillips. Do you have that? A. Yes.

"Q85. Would you explain what it is? A. This is a form that we in the Carbide Research Department fill out whenever we want to send or ship anything anywhere. It has spaces for information which describes the compound being shipped, and a space which tells what sort of container the material is in along with other information, whether or not it is poisonous or explosive. It also tells where the sample is located so that the people in the Shipping Department will know where to go in order to pick it up. It also identifies any letter of transmittal that was mailed at the time the samples were sent."

Leon Shechter of Bakelite testified as follows:

"Q18. Did you receive di(2,3-epoxycyclopentyl) ether as a result of the request contained in this letter? [Exh. 35] A. That is right.

"Q19. And were tests carried out on that sample so received, to your recollection? A. Yes.

"Q20. By whom was the testing carried out, if you recall? A. Directly by Mr. Commerford under the immediate supervision of Walter Guyer.

"Q21. By Mr. Commerford, whom do you mean? A. John Commerford.

"Q22. John T. Commerford? A. Right.

"Q23. Tell me as to the purpose, as you understood at the time, of testing di (2,3-epoxycyclopentyl) ether? A. The responsibility of the epoxy resins group, which is the group of Guyer and Commerford—

"Q24. That is at Bakelite? A. At Bakelite.—was to improve the performance of the resins which we were then selling and also to look for new structures which would broaden the utility of the epoxy resins system.

"Q25. In 1952 what was your relation to J. W. Guyer and J. T. Commerford in the course of your work? A. I was then section head and was responsible for the research of the group leader and the group. The group leader in this instance was Guyer, and one of his laboratory assistants was Commerford.

Commerford testified:

"Q23. In what terms did you refer to the sample you received in this notebook? A. The sample is referred to according to the label that was on the sample that we received.

"Q24. And what is that? A. Di(2,3-epoxycyclopentyl) ether No. 62.

■ There is no doubt that a small quantity of appellants' compound was sent to Bakelite by Union Carbide and there tested by Commerford. While each and every element of a reduction to practice must be corroborated, there is no fixed single formula in proving corroboration. It may be established by documentary evidence and the activities of others such as is patently shown in the record of the instant appeal.

Thurston v. Wulff et al., 164 F.2d 612, 35 CCPA 794, cited by the board is not controlling here since in that case the required corroboration was dependent upon the testimony of witnesses who received their information from appellant. Such is not the situation here. We conclude that appellants have amply demonstrated and sufficiently corroborated the fact that their compound possessed utility in the resin art.

■ Appellee argues that appellants 1952 experiments amounted to no more than abandoned experiments, pointing especially to the fact that a period of more than four years elapsed between the alleged reductions to practice and the filing of their application. We agree with the board that this contention is not

supported by the record. On May 10, 1954 Perkins, who at that time was vice president in charge of research at Carbide, sent a letter to Carbide's Patent Department recommending the filing of a patent application covering the compound. With the letter was enclosed a patent memorandum fully disclosing and describing the compound. We believe this evidence is sufficient to rebut a contention of an abandoned experiment.

For the foregoing reasons the decision of the Board of Patent Interferences is reversed.

Reversed.