51 CCPA

Charles B. SWAIN and Albert G. Schuessler, Appellants,

v.

Harvey E. MALLORY, Appellee.

Patent Appeal No. 7110.

United States Court of Customs and Patent Appeals.

April 9, 1964.

Rehearing Denied June 2, 1964.

Roy G. Story, Chicago, Ill. (Charles E. Bouton, Chicago, Ill., of counsel), for appellants.

Albert W. Bicknell, Hibben, Noyes & Bicknell, Chicago, Ill., Leo A. Rosetta, Washington, D. C., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

MARTIN, Judge.

This appeal is from the decision of the Board of Patent Interferences which awarded priority of invention to junior party Mallory in Interference No. 90,-050. That interference involves an application serial No. 586,361, filed May 22, 1956 by the senior party, Swain et al., and application serial No. 591,288, filed June 14, 1956 by the junior party, Mallory.[1]

The invention relates to a method of drilling oil or gas wells using an emulsion drilling fluid as set forth in the single count of the interference. That count reads:

"1. In the method of drilling through a subsurface formation wherein a drilling fluid is continuously circulated through a drill pipe and drilling bit, the improvement which comprises passing to the drilling bit a substantially solids-free oil-in-water emulsion drilling fluid including a continuous phase comprising an aqueous liquid, a disperse phase comprising a hydrocarbon oil, and a minor amount of a non-ionic emulsifying agent comprising a surface tension-reducing polyoxyalkylene compound."

The method is said to offer the advantage that the recited drilling fluid does not require the addition of a large proportion of solids as in conventional "drilling muds" for successful drilling and that it further has the property of rapidly precipitating out suspended solids from the fluid upon its being returned to the surface and being circulated through settling pits prior to the fluid's return to the drill pipe.

Only appellee took testimony and introduced evidence. Appellants elected to rely on their filing date. A major portion of appellee's testimony and evidence concerns nine well drilling operations conducted during the period of February 1955 through July 1955.

The board awarded priority to appellee on the basis of a finding that the evidence established that the chronologically last of those drilling operations, referred to in the record as the Thompson Well, constituted an actual reduction to practice. Appellants contend the board erred in that finding.

Three questions are posed by this appeal.

*Question No. 1*

The first question concerns whether the chemical composition of the emulsifying agent employed at the Thompson Well was properly proved by reliance on the testimony of one Curtis R. Kern.

The record shows that Kern, who was at that time a Sales Development Representative of Atlas, the supplier of the emulsifier material used by appellee in practicing the method of the count, was present and consulted by appellee throughout a period embraced by some of appellee's earlier drilling operations in evidence although Kern was not present at the last drilling operation in evidence, viz. the one at the Thompson Well. The record additionally shows that at the Thompson Well, one Holman worked directly with appellee in formulating the drilling fluid and introducing it into the well. Holman testified that an emulsifier referred to as GWD 126 was used at the Thompson Well.

The board found Holman's testimony in conjunction with the Mud Reports,

---

1. The interference originally included a third application of William A. Reddie and Eugene R. Werlein, serial No. 578,865, filed April 18, 1956. That application however was dissolved out of the interference as a result of the examiner's decision on motions.

Exhibits 21A–21D,[2] was sufficient to prove reduction to practice of the count except for identification of the emulsifier, which Holman knew of his own knowledge only as GWD 126. On this point the board said:

"For such identification we look to the testimony of Kern who originally supplied this material. In his testimony referring to Exhibit 24, an 'Atlox Emulsifier Information Bulletin' dated August 1954, Kern points out that Atlox 2081 which he gave to Mallory [appellee] is described in the bulletin as a blend of 70% Atlox 8916P and 30% Atlox 3300. Atlox 8916P is indentified [sic] therein as 'polyoxyethylene sorbitan esters of mixed fatty and resin acids', and is a 100% active non-ionic material. Atlox 3300, although not described in the bulletin, is stated by Kern to be 'an anionic material, an isopropyl amine salt of dodecyl benzene sulfonic acid', * *. In conjunction with the Grayburg well [one of the earlier drilling operations] Kern more specifically describes the non-ionic component of Atlox 2081 as 'polyethylene (16) sorbitan mono tall oil ester', * * * He told Mallory in February 1955 that the emulsifier was 'principally non-ionic' and was a 'tall oil ester ethylene oxide derivative—would do most of the work.' The composition of the anionic portion was still considered to be a 'trade secret' and not revealed to Mallory at this time, * * * Mallory did learn from Kern that Atlox 2081 contained 70% of a mon-ionic [sic] material and 30% of an anionic agent, * * * Kern explains that later after this well was drilled, due to concern with competitors of Great Western [Mallory's assignee] obtaining knowledge of the drilling fluid, it was decided that Atlox 2081 would be ordered under the code name GWD

126 and G 7598J or Atlox 7596J, a. purely non-ionic emulsifier, as. GWD–127 'and the drums so marked'; * * *. Thus, although Holman made no analysis of the emulsifier, we consider that identification of Atlox 2081 or GWD 126 is adequately supplied by Kern and that he did employ Atlox 2081 since Holman could rely on the code name on the drums placed thereon by agreement between Great Western and Atlas. * * * "

Appellants argue that appellee has: not offered any evidence or testimony relating to the actual material used at. the Thompson Well which would connect it with Atlas, Kern's employer, or otherwise identify the chemical composition, other than through appellee himself. It is contended that Kern's knowledge of the material identified as GWD 126 was hearsay stemming directly from appellee. Appellants urge that Holman, who used the material at the Thompson Well did not have the advantage of a label purporting to show the chemical identity and additionally, that no circumstantial evidence, such as shipping orders or letters of request, in connection with the procurement of such material has been introduced into evidence although it is. conceded that such items were offered in connection with the initial test operations at earlier wells. Appellants argue that since no train of evidence tending to connect the material GWD 126 used at the Thompson Well with its source of supply or to identify it has been offered by appellee, the identity of the material GWD 126 used at the Thompson Well is completely uncorroborated.

■ We are of the opinion that the board committed no reversible error in deciding that the chemical composition. of the emulsifying agent employed at the Thompson Well was properly proved by reliance on Kern's testimony and consider that appellee's evidence and testimony as a whole show that GWD 126;

---

2. Those exhibits are records of drilling mud tests made by Holman on June 4, 1955 and June 5, 1955 and of two tests made on July 8, 1955.

was a material within the scope of the count.

This court stated in Phillips and Starcher v. Carlson, 278 F.2d 732, 47 C.C.P.A. 1007:

"While each and every element of a reduction to practice must be corroborated, there is no fixed single formula in proving corroboration. It may be established by documentary evidence and the activities of others such as is patently shown in the record of the instant appeal."

and in a later case, Gianladis v. Kass, 324 F.2d 322, 51 C.C.P.A. 753, that:

"The goal of corroboration here is simply to establish that the inventor actually produced the product and knew it would work, by proof that could not have been fabricated or falsified. All the evidence must be considered in determining whether or not the appellant has met such requirement."

Moreover, in the Gianladis case this court did not agree with the board's position that the corroboration of an applicant's reduction to practice would require the corroborator to have tested a composition for its use and also to know *of his own independent knowledge* the chemical constituents thereof.

Appellee here introduced into evidence his Exhibit 38.[3] Kern was asked to account for the fact that this report "is so much longer than the other trade reports that have been in evidence" and he replied:

"I believe Mr. Mallory's comment, with which I open this trade report, is a good answer there; Mr. Mallory greeted me with, 'Boy, we got a bear by the tail!' During this visit, I became convinced that there was, indeed, a great deal of substance to some of Mr. Mallory's earlier assertions about the economic significance of this test work we had been doing, and I decided it was time to put the story down, to the best of my ability,

and get our top people in Wilmington [Atlas] aware of the implications this development might have."

In answer to the question asking if he could explain why the first page of the appellee's Exhibit 38 bears the heading "Confidential," Kern stated:

"Yes; during this visit, Mr. Tucker—Mr. R. C. Tucker, the President of Great Western Drilling Company—and others in Great Western had explained to me their desire to have confidential handling on all of the information pertinent to their work; also, I was aware that this might be a patentable development and, by marking the trade report 'confidential' in this manner, copies of it were carefully routed only to those whose business it was to know about it."

Kern in his oral testimony further explained the confidential nature of his work as follows:

"Q275. Mr. Kern, if my memory is correct, at the outset of your testimony, you testified, I think, that you left the employ of Atlas Powder Company temporarily on or about June 15, 1955. Is that correct? A. That is correct.

"Q276. From the time of your association with this invention of Mr. Mallory's up until June 15, 1955, what precautions, if any, are you aware of that were taken to keep this subject matter confidential and secret, as you testified? A. Well, starting back at the very early stages of this development, we started removing labels and putting code marks on our sample bottles when we would be—I believe I previously testified to that fact. During my trips in the field with Mr. Mallory—he's very widely known in mud circles and there would be lots of competitors, or rival mud companies, trying to buy his coffee and 'swab' him for what was this miracle stuff

---

3. Exhibit 38 is a trade report which Kern testified he had prepared as a result of

his visit with appellee the 19th of April, 1955, through the 22nd of April, 1955.

Great Western was using? And it got to be known as 'Mallory's mud' in the Permian Basin. And we had to be constantly on guard unless somebody in our office in Houston might give aid and comfort to the competition on this development. We started—I don't recall whether it was my suggestion or Mr. Mallory's that the drums that were getting into the field have their identifying marks obliterated; but this was a pretty common practice among other of my customers, to make it difficult for the competition to find out what they were doing."

In further reference to Exhibit 38, Kern testified:

"Q263. Now, Mr. Kern, on page four of the report comprising Mallory Exhibit 38, and also on page eight of the same report, I find reference to the designation G–7596J, and on page 8, I also find reference to the names GWD 126 and GWD 127. Would you please explain the meaning of those terms and your knowledge of the identification of the materials they would apply to? A. Refresh me; did you ask for both chemical identity and what it applies to?

"Q264. I am trying to cover too much in one question. Let's take G–7596J first, as it appears on page four and eight. Would you please tell me the origin of that code number and the chemical identity of the material it applies to? A. This is the Standard Atlas identification for a 100% active non-ionic emulsifier consisting of 10 mols of ethylene oxide reacted with sorbitan monolaurate.

"Q265. And, on page eight, the names *GWD 126* and GWD 127, what is your knowledge of the origin

of those designations and the chemical identification of the materials they apply to? A. We were concerned that, because of the widespread knowledge of Atlas emulsifiers in the southwest, somebody might find out what we were doing that had no proper reason for doing so; *so it was agreed that our Atlox 2081 would be ordered under their code name GWD 126;* and G–7596J would be ordered under their name, GWD 127, *and the drums so marked."* [Emphasis ours.]

The next-to-the-last paragraph of Exhibit 38 states:

"For the time being, Great Western will have Starr Gas Company [4] *order* ATLOX 2081 under their code name GWD–126 and also G–7596J will be *ordered* under their name GWD–127." [Emphasis ours.]

We think the clear import of the above testimony and evidence is that the code number practice was part of the intercompany confidential arrangement requested by Tucker and was the result of an "agreement between Great Western and Atlas," as expressly found by the board. We agree with appellee that if the Atlas emulsifiers were to be "ordered" by Great Western from Atlas, the supplier, under the code number GWD 126, then Atlas would necessarily have knowledge of the code arrangement to be able to fill the orders.

Accordingly, since we think the record demonstrates that GWD 126 is synonymous with Atlox 2081 and that Kern has identified the chemical constituents of Atlox 2081, we consider that the record adequately identifies the emulsifier employed by Holman.

*Question No. 2*

█ The second question in this appeal is whether the count may be proved to have been reduced to practice at the

4. In answer to a question how the Starr Gas Company was a part of the arrangement, Kern testified that:

" * * * And the Star [sic] Gas Company truck—or, rather, the Star [sic]

Gas Company, was going to supply the diesel fuel for this job, and it was convenient to have their truck pick up the emulsifier [at the warehouse] and deliver it to the location."

Thompson Well by Holman's use of Atlox 2081 which the record shows to be a mixture of an anionic emulsifier and a member of the class of non-ionic emulsifiers recited in the count.

Appellants argue that where the inventive feature of a method count in an interference is attributed solely to a recited non-ionic emulsifier, although the count is broad enough to include the presence of other material, proof of reduction to practice of the count requires a showing that the use of the recited emulsifier alone, and not in mixture with another different emulsifier material, is necessary.

The board, on the other hand, in holding that Holman's use of Atlox 2081 satisfied the count, stated:

"* * * The count is taken from the Mallory [appellee] application which contains many examples of mixed emulsifiers in which the major portion only is non-ionic. The count was obviously intended to read on such mixtures as well as on a purely non-ionic emulsifier. The language of the count is, moreover, such that its coverage cannot be restricted to a non-ionic material nor can it be maintained that to obtain the desired advantages of the invention the 'non-ionic emulsifying agent' must consist of 'a surface tension-reducing polyoxyalkylene compound.'

"The count plainly reads 'comprising', not *consisting of* and thus reads on any emulsifying agent containing the polyoxyalkylene compound in sufficient quantity to function as a non-ionic emulsifying agent. The count is further open to the inclusion of unspecified materials in that it employs 'including' before 'a continuous phase', 'comprising' before 'an aqueous liquid' and 'comprising' before 'a hydrocarbon oil.'"

In the factual situation before us we find no reversible error in this holding of the board. The record shows that in appellee's reduction to practice a non-ionic emulsifier of the class recited in the count was used. Although in appellee's reduction to practice the drilling fluid contained also an anionic emulsifier, we think the count in reciting such terms as "comprising" and "including" rather than "consisting of" does not exclude the presence of an anionic emulsifier in the drilling fluid recited therein. This court has held on many occasions that "comprising" does not exclude ingredients not specifically mentioned in a claim. In re Davis et al., 189 F.2d 292, 38 C.C.P.A. 1088; In re Hunter, 288 F.2d 930, 48 C.C.P.A. 887; In re Halley, 296 F.2d 774, 49 C.C.P.A. 793, and that "comprising" is equivalent to "including." In re Lincoln and Henriksen, 150 F.2d 576, 32 C.C.P.A. 1213. Moreover, in Loukomsky v. Gerlich, 264 F.2d 907, 46 C.C.P.A. 805, this court, in reversing the board's holding that a patentee's original patent did not disclose the invention of the count,[5] stated:

"It is elementary that, in the absence of ambiguity, the counts of an interference are to be given the broadest interpretation which they will reasonably support. Stern [et al.] v. Schroeder [et al.], 36 F.2d 518, 17 CCPA 690; Hartog v. Long [et al.], 47 F.2d 365, 18 CCPA 993; Field v. Stow, 49 F.2d 840, 18 C.C.P.A. 1437.

* * * * * *

"While the Board of Patent Interferences held that 'Loukomsky's original patent did not disclose *the invention* of the count and it is not inherent therein,' (emphasis ours) the reasons on which that holding was based appear to be directed to what Loukomsky is entitled to claim in a patent, rather than to what he

5. The count before the court in that case read:
"A process for the production of well-adhering coatings on the surface of polyethylene articles which comprises applying thereto a solution containing an interpolymerization product of a major proportion of vinyl chloride and a minor proportion of a vinyl ester and drying the applied coating."

discloses. The board emphasizes the fact that Loukomsky indicates in his specification that the presence of additional materials in the solution is of critical importance and that he does not teach that such materials might be omitted. That fact might be important if the count were limited to the use of a coating composition *consisting* of a solution of a viny copolymer \* \* \*."

The count before us obviously was intended to read on drilling fluids containing ingredients not specifically recited therein. For example, although appellee in his application states that the invention is based on the use of certain non-ionic emulsifying agents in his oil-in-water emulsion drilling fluid, he teaches that it is advantageous to include a minor amount of an anionic oil-in-water emulsifier. Moreover, there is nothing in the record as to appellee's reduction to practice which convinces us that the presence of the anionic emulsifier has a detrimental effect on the non-ionic emulsifier, Smith v. Swaine, 127 F.2d 140, 29 C.C.P.A. 973. Kern, when asked about the nature of the anionic material in the Atlox 2081 used in appellee's reduction to practice, stated:

"It is an an-ionic [sic] surfactant. It happened to have the unique ability to *help the primary emulsifier,* in this case Atlox 8916P, *with regard to bloom, or ease of distribution,* the ability of the emulsifiable concentrate to spontaneously make itself into an emulsion when it contacted water." [Emphasis ours.]

Appellants place heavy reliance on Vandenberg v. Reynolds, 268 F.2d 744, 46 C.C.P.A. 938. We think the Vandenberg case involved a very different factual situation. In that case the problem revolved around the question of just what Vandenberg used as a catalyst in certain experiments on which he relied to sustain his burden of proof. To establish an actual reduction to practice of the count in that case it was necessary to prove that a polymerization reaction

was being catalyzed by 1-hydroperoxy-1-phenylcyclohexane, referred to by appellant in that case as PCH. As to Vandenberg's alleged reduction practice, the court, in referring to a portion of the "catalyst composition" relied on, stated:

"\* \* \* we are asked to proceed on the assumption that it was 'very probably PCH.' *We cannot, however, accept mere probability or likelihood as proof of an actual reduction to practice.*

"*What Vandenberg used as a catalyst, therefore, giving him the benefit of every doubt and accepting his contentions, many of which are strongly contested,* was the product of the oxidation of phenylcyclohexane, 69.9% of which was unreacted pure phenylcyclohexane, 56% of the remainder being the compound called for by the count and 44% of the remainder being admittedly unknown but possibly other phenylcyclohexyl hydroperoxides not conforming to the count. Thus the proofs are, at best, that 16.8% (56% of 30.1%) of Vandenberg's 'catalyst composition' was PCH. This is the reality of the situation behind Vandenberg's oft reiterated statement that the June, 1949, tests were made 'using PCH as catalyst.'" [Emphasis ours.]

In contrast to the Vandenberg case we think the record here is clear that a non-ionic emulsifier of the class recited in the count was used in the drilling operation at the Thompson Well.

*Question No. 3*

The third question involved in this appeal is whether Kern was a coinventor of the invention in issue and whether, therefore, he cannot serve as a corroborating witness on behalf of appellee.

It is appellants' contention that appellee's testimony and evidence show that appellee could not have arrived at the invention without Kern's assistance since only Kern was able to prescribe suitable emulsifiers. Accordingly, appellants ar-

gue that Kern appears to be a necessary joint inventor and thus should be "disqualified as a corroborating witness."

This court has considered that it is axiomatic that an interference is limited to a determination of priority and questions "ancillary" thereto and that third party inventorship is not one of those questions. Mortsell et al. v. Laurila, 301 F.2d 947, 49 C.C.P.A. 1028. Since we do not think the question of third party inventorship is properly before us, we do not think that Kern should be "disqualified as a corroborating witness." Moreover, even assuming the question of third party inventorship was properly before us, we do not think the record establishes that Kern was an inventor of the subject matter in issue.

The record shows that Kern did not file any patent application, either sole or joint, as to the involved subject matter. Moreover, in his oral testimony he did not hold himself out as an inventor.

The record further shows that appellee, prior to his initial meeting with Kern, had formed the concept of employing as a drilling fluid an oil-in-water emulsion produced with a non-ionic emulsifying agent or "ethylene oxide adduct" [6] and containing substantially no solids.

When appellee was asked how he happened to originate and complete the invention defined in the count, he testified:

"A. I was employed by Great Western—I went to work November 1, 1954. I knew prior to the time, oh, I would say October 1, 1954, what my duties would be and what would be expected, the thought being that an effort would be made utilizing my knowledge of drilling fluids and working in cooperation with R. J. Bromell, Chief Drilling Engineer, to improve drilling rates to efforts directed at formulating better drilling fluids. I spent a part of the month of October in review-

ing the literature in respect to the use of surfactants and, taking into consideration the character of the waters necessary—that it would be necessary to use in drilling fluids in West Texas, in the areas Great Western operated in, it was obvious that any surfactant used would, by necessity, have to be a non-ionic. And, after coming to Great Western within a week after employment, I happened to be in Houston, talking to the Hughes Tool Company, discussing some of the studies that they had made relative to drilling mud effect on drilling rate; and, while there, I contacted Mr. Kern with Atlas Powder, describing to him what I would like to accomplish, and asked if they might be able to furnish us a material from their surfactant line which could be used in formulating emulsions in the absence of solids."

When questioned as to the composition of the drilling fluid he wanted to use, prior to his initial meeting with Kern, appellee testified:

"A. Well, I knew that the job that the material was to be asked to do and the atmosphere in which it was to be used would require it would be non-ionic. As to having any formed conclusions as to the material, itself, at the time I talked to Mr. Kern, no. I knew it would have to be a non-ionic and so stated to him."

Kern's position as to his first meeting with appellee is set forth by the following excerpts from Kern's testimony:

"Q28. Mr. Kern, what is the subject matter of this trade report, Mallory [appellee] Exhibit 3;[7] what does it cover generally, what event? A. Well, this is the report covering Mr. Mallory's first visit with me in Houston.

---

6. The record shows that an "ethylene oxide adduct" is a polyoxyalkylene compound.

7. Exhibit 3 is a trade report prepared by Kern after his initial meeting with appellee.

"Q29. On what date was that? A. On November 8, 1954.

"Q30. Mr. Kern, about ten or twelve lines down from the top of Mallory Exhibit 3 there's a sentence containing the words, 'I was getting discouraged until Mr. Mallory told me that the solids content of this liquid would be kept to the absolute minimum'. What was the significance of that statement by Mr. Mallory to you? A. Well, for many years we had had a standing problem to make oil-in-brine emulsions for drilling muds, in which the brine actually contained a very high percentage of drill solids, and possibly added bentonitic material. We had found many of our non-ionic emulsifiers that would make apparently very stable emulsions, but invariably the solids portion would conglomerate and much of the oil would attach itself to them and generally they would fall out or float to the top; and the mud companies that I had contacted previously on the problem were always aghast that this had happened to the solids and quite positive that the solids must be allowed to remain and to contribute their own effect towards viscosity and gel strength.

"Q31. And what did Mr. Mallory tell you about his requirements in that respect? A. I remember very vividly that, in his own brand of colorful language, Mr. Mallory told me he didn't want any blankety-blank solids in the emulsion.

"Q32. What else did Mr. Mallory tell you about his planned development in the drilling fluid field, other than the low solids? A. Well, I told him if he knew what he was talking about, and he seemed very certain he did, that I agreed with him, non-ionic emulsifier could certainly be picked to do the job.

"Q33. What type of emulsion did he tell you that he wanted? A. Well, he had in mind an oil-in-water emulsion.

"Q34. What type of oil did he contemplate using? A. Diesel fuel or crude oil.

"Q35. Mr. Kern, when Mr. Mallory explained to you that he didn't want any solids in his emulsion drilling fluid, what was your reaction? A. *Well, I was very surprised, as I considered myself to be pretty well informed on drilling fluids of the oil-in-water emulsion type; and to my knowledge, this was the first time anybody had ever suggested this might be a useful drilling fluid.* I felt sure that we could do it, and it sounded like a terrific new application for us.

"Q36. *Would you say that you were skeptical, to any degree, of Mr. Mallory's views?* A. Yes, I was.

"Q37. You mentioned earlier that you told Mr. Mallory you agreed that a non-ionic emulsifier would do the job. Did Mr. Mallory ask you or tell you that he proposed to use a non-ionic emulsifier; how did non-ionic emulsifier come into the conversation? A. I believe that had to do with my interest in how come Mr. Mallory to contact us.

"Q38. I see. A. I believe he had learned from somebody else in the trade that Atlas, one of the non-ionic manufacturers, had an office in Houston; possibly had my name. I don't know.

"Q39. And, at this point, could you summarize for us what Mr. Mallory's initial request was of you, what he wanted of you? A. He wanted me to suggest the specific emulsifier to make the kind of oil-in-water emulsions that he had described consisting of some five to twenty per cent diesel fuel in fresh to brackish to saturated salt waters, and I agreed to make such a selection for him. I was planning on a trip to Wilmington where I would have an opportunity to talk with some of our laboratory people there, and I planned to send the sample

after discussing the problem with some of our laboratory leaders there.

"Q40. Was there any discussion by Mr. Mallory, any mention by Mr. Mallory, of the type of emulsifier that he desired for this application? A. Well, he knew he wanted a non-ionic one; he hoped it would be cheap.

"Q41. Was it? A. And I suspected—I think we talked a good deal; I think I assured him they would be liquid, easily obtainable. That sort of thing.

"Q42. Was there anything in this discussion, November 8, 1954, with respect to the chemical identity of the emulsifier that might be used? A. I don't recall.

"Q43. Did Mr. Mallory display to you any knowledge of the type of non-ionic emulsifiers made by Atlas, the general type? A. Yes, he was acquainted with the fact that Atlas made a substantial line of non-ionic surfactants and emulsifiers, and I'm sure he figured that we would pick one of the type that would be best suited to make an oil-in-water emulsion, rather than a water-in-oil emulsion, for example.

"Q44. On that occasion, did he mention ethylene oxide adducts? A. I believe Mr. Mallory always referred to—most frequently referred to non-ionics as 'ethylene oxide adducts' instead of saying 'polyethylene derivative'. He most frequently refers to them as 'ethylene oxide adducts'.

"Q45. Did he so refer to them at your 1954 meeting, as far as you can recall? A. I believe so." [Emphasis ours.]

On cross-examination, Kern testified:

"Q311. Now, it has been alleged here that Mr. Mallory first talked to you in November of 1954. Now, without reference to any document which you may have prepared or which some other person may have prepared, what is your exact recollection of the problem posed by Mr. Mallory? I don't want that influenced by anything that you have read subsequent to that time. A. I believe that most people who first meet H. E. Mallory in connection with a drilling problem will retain a vivid recollection of that meeting—and I certainly do. Mr. Mallory explained to me that he wanted to make a high speed drilling fluid, explained some of the work that others in the field had been doing, which indicated that, in fact, a high speed drilling fluid was the best area for improving penetration rates, and that he wanted an Atlas emulsifier that would hold up in these oil field waters, which are usually hard, brackish, or even saturated brine. And very quickly I told him, 'Yes, I'm sure we can make that kind of emulsion, but I happen to know that's not what you want. You see, I did this same thing many years ago, and the emulsion is fine, *but with all of these families of non-ionics that we had, you "clobber" the solids and kick the solids out'; and, in his very colorful, unique manner, he explained he didn't want any solids in his mud, that that was what he was trying to get away from.*" [Emphasis ours.]

Appellants argue that appellee has indicated that he relied on Kern's technical ability to select a suitable emulsifier, that Kern had told appellee at the time of their meeting that he felt that some sort of tall oil derivative sorbital with the proper amount of ethylene oxide would work and that Kern at that time knew that the proper emulsifier would have to be a non-ionic ethylene oxide adduct having a high enough HLB number (hydrophilic-lipophilic-balance) to yield an oil and water emulsion, and that this would have eliminated certain Atlas non-ionic ethylene oxide adduct surfactants.

We do not regard that Kern's suggestion of a specific Atlas product to be

tried by appellee, the record showing that that product was already well established as an emulsifier in the agricultural field, would make Kern an inventor of the subject matter of the count. As pointed out above, the record shows that, prior to appellee's initial meeting with Kern, appellee had conceived of employing as a drilling fluid an oil-in-water emulsion produced with a non-ionic ethylene oxide adduct and containing substantially no solids. Kern's suggestion of the use of the specific ethylene oxide adduct is certainly not a conception of the entire invention of the count. At most what Kern did was to render partial aid to the appellee. See Polye v. Uhl, 328 F.2d 893, 51 C.C.P.A. ——. Certainly an inventor is not precluded from using sources of specialized information in developing his invention and Kern, as a Sales Development Representative of a company supplying emulsifiers, was a logical one for appellee to inquire of here. Moreover, Kern did not file a patent application on the subject matter and is not otherwise urging he was an inventor or co-inventor. Accordingly, assuming the question of third party inventorship was properly before us, we do not consider that Kern was a co-inventor of the invention in issue.

■ Appellants have moved that the costs of preparing so much of the printed record as includes the added material be taxed against appellee. Upon agreement of the parties, action on the motion was deferred until final decision. We find that part of the added material was properly included in the record while the remainder was unnecessary. The printing costs being the only costs handled through the court, the motion is granted to the extent that one-third of the costs of printing the added material is assessed against appellee and the remainder of said costs is assessed against appellants.

Since we find no error in the board's holding of appellee's reduction to practice at the Thompson Well, its decision is affirmed.

Affirmed.