36 C.C.P.A. (Patents)

## REED v. CISLAK et al.

### Patent Appeal No. 5604.

United States Court of Customs and Patent Appeals.

June 28, 1949.

Ralph Loring Dugger and Paul, Paul & Moore, Minneapolis, Minn. (Edward B. Beale, George R. Jones, and Beale & Jones, Washington, D. C., of counsel), for appellant.

Stone, Boyden & Mack, Washington, D. C. (J. Austin Stone, Washington, D. C., of counsel), for appellees.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, and JOHNSON, Judges.

JACKSON, Judge.

This is an appeal in an interference proceeding from a decision of the Board of Interference Examiners of the United States Patent Office, awarding priority of invention of the subject matter defined in four counts to appellees.

The interference involves an application of appellant, serial No. 510,376, filed November 15, 1943, and an application of appellees, serial No. 436,168, filed March 25, 1942. Appellant, being the junior party, has the burden of proving priority of invention by a preponderance of the evidence.

Both parties took testimony, filed briefs, and were represented at the final hearing before the board.

Appellant in his brief before the board conceded priority of invention as to count 1. Consequently, the board did not discuss tendered proof with respect to that count, and rendered judgment in favor of appellees.

In their brief before us, counsel for appellant state that after an examination of the record, appellant is convinced that it is not sufficient to establish his priority of invention as to count 2. Treating this statement as a motion to dismiss the appeal as to that count, such motion will be granted.

Therefore, counts 3 and 4 only are before us. They read as follows:

"3. The process which comprises mixing sulfuric acid and a compound having the structure

where R is selected from the group consisting of hydrogen and alkyl and 'N is the pyridine ring, and reacting the resultant mixture with nitric acid at elevated temperatures and recovering the so formed pyridine carboxylic acid.

"4. The process which comprises mixing sulfuric acid and quinoline, reacting the resultant mixture with nitric acid at elevated temperatures and recovering the so formed nicotinic acid."

The invention relates to the production of a pyridine carboxylic acid. Its specific purpose is the production of nicotinic acid by the oxidization of certain pyridine derivatives with nitric acid at elevated temperatures.

In its decision the board held that the record of appellant did not contain sufficient evidence as proof of actual reduction to practice for the reason that the testimony of appellant had not been adequately corroborated, and that appellant had not exercised reasonable diligence during the critical period of from just prior to appellees' record date of March 25, 1942, up to appellant's filing date of November 15, 1943. The board did not review the testimony of appellant in detail, but set out sufficiently the testimony of the two witnesses who were called to corroborate appellant's testimony.

Counsel for appellant in their brief object to the way in which the testimony of appellant was treated, and further claim that the board considered only a few selected

portions of all of the testimony offered on behalf of appellant.

It appears that appellant is highly skilled in the chemical art and for many years was engaged in chemical research. He is a successful inventor, having had a number of patents issued to him identified with chemical inventions.

At the time of taking testimony, appellant was Director of Research of Federal Cartridge Corporation, Anoka, Minnesota, and had long experience in the explosives and nitrating fields, involving the nitration of toluol and xylol. He was active in that field about 30 years prior to his activities with respect to the present case. He stated that he had noted in his previous work that certain impurities of toluol and xylol were oxidized and the oxidized residues were found in the Pauling tower concentration pans. It appears that he and others were of opinion that those oxidized products were due to heterocyclic compounds which were present as impurities and which oxidized to oxalic acid in the process. That chemical experience was remembered and used by appellant when he began his research in the problem of the synthesizing of nicotinic acid.

Appellant's first experiments involved the use of quinoline, quinaldine, picolines, and the lutedines as starting materials. Those experiments, the witness stated, were begun sometime around the latter part of 1940 and in the early part of 1941. He first reacted quinoline for the reason that it was available in the laboratory of his company, where he found three or four ounces that had been in the laboratory since 1931.

He stated that in his first experiments he mixed about 10 grams of quinoline with about 10 cc. (18½ grams) of 95% sulphuric acid in an Erlenmeyer flask, 250–300 milliliter capacity, and heated the mixture on a hot plate under a laboratory hood. He dropped into the mixture, by means of a dropping funnel, about 50 cc. of 70% nitric acid. The batch boiled over during that process and in a subsequent process, and therefore those two experiments resulted in nothing. He afterwards repeated his process, taking it "a little slower." That

reaction, he said, continued for about 1 to 1½ hours with maximum temperature of 220°C. He said it would sublime, tested it for nitrogen, and gave it the Merck-Handbook nicotinic acid test by using 2, 4-dinitro-chlorobenzene. He concluded that the product was nicotinic acid.

█ All during his experimentation, appellant kept notes, made entries in his notebook, and sent reports to others. He was exceedingly careful in that respect. However, we have held many times that such record and reports sent to others are not of themselves alone sufficient to establish corroboration, for the reason that they are in the category of self-serving declarations. Patterson et al. v. Clements et al., 136 F.2d 1002, 30 C.C.P.A., Patents, 1262; Kear v. Roder, 115 F.2d 810, 28 C.C.P.A., Patents, 774; Collins v. Olsen, 102 F.2d 828, 26 C.C.P.A., Patents 1017.

The two witnesses whose testimony was intended to corroborate the testimony of appellant were also employed by the Federal Cartridge Corporation and worked in the same laboratory as appellant, but not together nor constantly during all of the time during which appellant's experiments were being made.

One of the witnesses stated that he first learned about the research work of appellant, in his search for the production of nicotinic acid, in February 1941. He testified that appellant used quinoline and sulphuric and nitric acids in carrying out his process. He recited details of the apparatus used, procedure, proportions of ingredients, concentrations, and temperatures. He further testified that he saw the product during the course of its preparation, and as isolated, as well as the results of the tests made to identify the isolated product. Such testimony might appear to be sufficient corroborating evidence. However, the witness stated he did not see the tests actually made. It is difficult for us to understand, in view of the fact that the witness did not see those tests, how he could in reason give the detailed information which has just been noted. He stated that he had observed appellant from time to time as he was going about his work and he stated

that he observed the boiling over of the unsuccessful runs. That he stated he remembered because he happened to be there when it occurred. Naturally, being in the same room the boiling over of the run would be observed by anyone present, although he may not have known anything about the experiment. The witness further stated that he never read the thermometers upon which the temperatures of the runs were being recorded. The only clear cut statement to be found in the witness' testimony was that he was present during an experiment by appellant when the material boiled over, and as conceded, that experiment amounted to nothing. The witness, in our opinion, could not have testified to the vital temperatures used because he never read the thermometers. Furthermore, as he stated, he only saw the color of the color test for nitrogen after that test had been completed, and he did not see appellant carry out the identification of the product obtained.

■ That witness was a skilled chemical engineer and unquestionably had discussed with appellant—although the witness was engaged in research along a different line—the things that appellant contemplated doing, was doing, or had done, and, therefore, after a long period of time without any notes or documents to refresh his memory, we think it was proper on the part of the board to give his oral testimony careful scrutiny. Sneed v. McConkey, 76 F.2d 422, 22 C.C.P.A., Patents, 1151. Applying the same criterion to the witness' testimony, depending entirely upon memory, we are constrained to hold that his testimony was not sufficient to adequately corroborate the testimony given by appellant. All of the witness' testimony was confined to the period from either February or March 1941 to July of that year, when he left that company to enter the Twin City Ordnance Plant.

The second corroborating witness began his employment with Federal Cartridge Corporation in August, 1941. He stated that he was to work under appellant in research work. He had a long conversation with appellant at their first meeting, during which he stated that appellant had acquainted him with some of the work he was doing and suggested he do some reading covering that kind of work. The witness stated that such reading occupied his time for about a week or ten days after having become acquainted with the plant and its processes. He said that among other things related to him by appellant was his work in the oxidation reactions, such as are here involved, and that appellant mentioned the oxidation of quinoline and its allied compounds with sulphuric acid and nitric acid. The witness stated his understanding of the term "allied compounds" included quinoline, quinaldine, and the picolines. Appellant, the witness stated, expected to get satisfactory yields of nicotinic acid, and that he (the witness) began his preliminary work with a small amount of quinoline during the latter part of September after he had read up on the pertinent literature. According to the witness' recollection, appellant carried out experiments on the oxidizing of quinoline and sulphuric acid with nitric acid; that the runs were carried out under the laboratory hood; that a reaction flask was used, containing the mixture of sulphuric acid and quinoline, to which nitric acid was added through a dropping funnel under reflux conditions; and that the reaction mass was heated on a hot plate. He stated that while he could not say exactly what the range of temperatures were, that they ran up from 225° to 250° C., and that several runs were made. The witness spoke of a reaction which covered a period of hours, and that he (the witness) was starting work on those reactions at the same time. He stated, as appears from that witness' testimony, that the experiments were continued over a period of weeks, and later on were continued by other chemists over a period of months. At the completion of the experiments, the witness testified that the reacted mixture was cooled, diluted, and neutralized for recovery. With respect to recovery, he stated, "Well, naturally we retained copious volumes of sodium sulphate, and through repeated washings, concentrating and evaporating dryness, a small yield of the oxidation product was obtained." The re-

sultant product, the witness said, looked like almost colorless crystal needles, having a yellow cast to them. He observed that appellant constantly made notes during the experimentation and identified a notebook as the type of book that was used. In November or the early part of December 1941, the witness was transferred to different work, and therefore stopped working on the oxidation research. We find nothing in the testimony of that witness to prove the identity of the recovered product. Therefore, since that testimony did not corroborate the testimony of appellant—that the sought nicotinic acid was produced —the testimony of the witness fails in a vital respect.

■ Counsel for appellant in their brief contend that the testimony of appellant, together with that of the second corroborating witness, and the exhibits constitute proof of diligence as early as August 28, 1941, as well as reduction to practice about the middle of October through October 24, 1941. The notations so carefully kept by appellant have not been properly authenticated with respect to the accuracy of their contents, and must therefore, as we have hereinbefore noted, be considered as self-serving declarations. The testimony of appellant is clear and seemingly accurate, but because of the sound and well established rules of evidence in interference proceedings, requiring corroboration of the actions of an applicant for a patent, and we find, as did the board, that proof concerning vital elements of appellant's activities is wanting, it is necessary for us to hold that appellant has not established actual reduction to practice of the subject matter of the counts.

■ We find no satisfactory proof of reasonable diligence during the hereinbefore mentioned critical dates—just prior to March 25, 1942, the date of appellees' application, and November 15, 1943, appellant's filing date. Because of that lack of proof, a prior conception on the part of appellant cannot overcome the constructive reduction to practice resulting from the filing of appellees' application on March 25, 1942. Therefore, we see no reason why the evidence of appellant should be considered with respect to his claimed date of conception.

For the reasons hereinbefore stated, the appeal is dismissed as to count 2, and the decision of the Board of Interference Examiners is affirmed.

Affirmed.

By reason of illness, HATFIELD, Judge, was not present at the argument of this case and did not participate in the decision.