56 CCPA

**Vincent J. FRILETTE and Paul B. Weisz, Appellant,**

v.

**Charles Newton KIMBERLIN, Jr. and Elroy Merle Gladrow, Appellee.**

**Patent Appeal No. 8141.**

United States Court of Customs and Patent Appeals.
June 26, 1969.

Patent Interferences awarding Kimberlin and Gladrow (Kimberlin et al.) priority as to the two counts in interference No. 92,280, involving Kimberlin et al. patent No. 2,971,903 [1] granted on an application filed February 5, 1957 and an application of Frilette et al.[2] filed on September 26, 1958. The Kimberlin et al. patent is assigned to Esso Research and Engineering Company and the Frilette et al. application to Mobil Oil Corporation.[3]

As junior party having the burden of proving priority by a preponderance of the evidence, Frilette et al. have submitted testimony and documentary evidence which they advance as showing actual reduction to practice of count 1 prior to February 5, 1957 and conception of count 2 prior to that date coupled with diligence to a subsequent actual reduction to practice.

Kimberlin et al. introduced no evidence of activities prior to their February 5, 1957 filing date and are thus restricted to that date for conception and reduction to practice.

### The Subject Matter in Issue

The subject matter in issue relates to a process using a new type of aluminosilicate catalyst for upgrading hydrocarbons. In contrast to older aluminosilicate catalysts which were amorphous gels comprising pores having a wide range of sizes from 5 to as much as 200 Angstroms [4] in diameter, the catalysts involved here comprise highly crystalline material characterized by pores of nearly uniform dimensions in the range of about 6 to 15 Angstroms.

The counts, which are verbatim copies of claims 1 and 2 of the Kimberlin et al. patent read:

1. A process for upgrading hydrocarbons which comprises contacting a

Oswald G. Hayes, Raymond W. Barclay, New York City, Richard K. Stevens, Davidson C. Miller, John F. Witherspoon, Washington, D. C., attorneys of record, for appellant; Stevens, Davis, Miller & Mosher, Washington, D. C., of counsel.

Whelan, Chasan, Litton, Marx and Wright, Seymour Stahl, Linden, N. J., for appellee; Malvin R. Mandelbaum, Robert D. Fier, Douglas G. Brace, Kenyon & Kenyon, New York City, of counsel.

Before RICH, Acting Chief Judge, ALMOND and BALDWIN, Judges.

BALDWIN, Judge.

Frilette and Weisz (Frilette et al.) appeal from the decision of the Board of

---

1. Granted February 14, 1961 and entitled "Hydrocarbon Conversion Catalyst."

2. Serial No. 763,433, entitled "Catalytic Conversion of Hydrocarbons."

3. Formerly Socony Mobil Oil Company, Inc.

4. An Angstrom, frequently designated "A", is a unit of length equal to one ten-billionth of a meter.

hydrocarbonaceous fluid in a conversion zone at elevated temperatures with a crystalline metallic aluminosilicate catalyst having uniform pore openings between about 6 and about 15 Angstrom units, said material being the sole conversion catalyst in said zone and recovering an upgraded hydrocarbon product having a molecular weight no higher than said first named hydrocarbonaceous fluid.

2. The process of count 1 wherein said catalyst comprises a member of the alkaline earth group.

Frilette et al. are involved on modifications of these counts which define the size of the pore openings as between "about 6 and about 13" Angstrom units instead of between "about 6 and about 15" Angstrom units.

## Preliminary Issue

Before us, Frilette et al. have devoted a very substantial part of their briefs and their entire oral argument to an issue based on the fact that Kimberlin et al. were granted a reissue[5] of their involved patent on April 11, 1967, which was after the board made its award of priority to them on October 6, 1966 and adhered thereto on reconsideration. The application for the reissue patent was filed during the pendency of the interference and Frilette et al. were notified of its filing and given access thereto by the Commissioner in accordance with the Patent Office practice,[6] such notice being received by Frilette et al. after the expiration of the motion period. The reissue application had been prosecuted to what the examiner deemed allowable condition during the interference proceedings, but repeated petitions by Kimberlin et al. for issuance of the patent thereon before the priority decision of the board were denied. Included in the reissue patent, which embodies the same specification as the original patent are two claims duplicating the interference counts and seven other claims which

Frilette et al. state are either identical or "substantially" identical to claims in their application. Frilette et al. further state that five of the latter claims are broader in scope than the counts of the interference.

Frilette et al. argue that, since the reissue patent has now issued and the original patent on which it is based has thus been surrendered, either the interference contest must be considered to have been abandoned by Kimberlin et al. and the proceedings terminated, or the reissue patent must be considered to have been somehow substituted for the original patent. They urge that, if the former condition exists, Kimberlin et al. have "in effect, withdrawn * * * [their] entire case-in-chief" and Frilette et al. are entitled to judgment. They further contend that, if the reissue patent has been substituted, the case should be remanded to the Patent Office for further proceedings. By "further proceedings" they apparently mean to include introduction of additional evidence and determination of priority as to other claims in the reissue patent.

■ We do not agree with those arguments of Frilette et al. In the first place, it is plain that Kimberlin et al. still have a patent claiming the precise subject matter of the counts and have not abandoned that subject matter. Also, they are still entitled to the February 5, 1957 filing date of their original application and thus plainly have not withdrawn their "case-in-chief." The question whether the board erred in its award of priority is still before us on the evidence of record and the briefs and oral arguments of the parties. No sound basis is advanced for allowing Frilette et al. to introduce any additional evidence as to the present counts.

■ The possibility that further interference proceedings involving the Kimberlin et al. reissue patent might be initiated to determine priority of broader subject matter provides no sound reason

5. Reissue patent No. 26,188, granted on an application filed August 24, 1962.

6. Manual of Patent Examining Procedure, section 1111.08.

for delaying the determination of the present appeal by remand. Under 35 U.S.C. 135, the question whether further interference proceedings are in order is a matter for determination by the Commissioner of Patents and is not appropriate for our consideration here. Also, it is noted that Kimberlin et al. observe in their brief that refusal by us to remand "can in no way affect any rights which appellants may have to contest priority as to other claims of the reissue patent."

The appeal will therefore be considered on the merits.

### The Frilette et al. Proofs

The evidence of Frilette et al. includes the testimony of a number of witnesses who were employees of Mobil at times relevant to the interference and many documentary exhibits. The exhibits were generally identified by the name of the witness who first testified concerning them, followed by sequential numbers.

Identifying the witnesses, the co-inventor, Paul B. Weisz, was a research associate heading a group within a Physics Research Section of the Mobil Laboratories at Paulsboro, New Jersey, which section was headed by Dr. Clark. The other inventor, Dr. Frilette, was an assistant of Weisz who joined Mobil in 1956. Drs. White and Prater were under Dr. Clark's direction and Rudolph Lago was a research employee who reported to Prater. Emil Mower was an assistant who did test work under Weisz but was assigned at some time in 1956 to work for Frilette. Other of the witnesses were employees of the Analytical Section of Mobil who testified concerning analytical work done either by them or under their direct supervision for others, including Frilette. Those include Sawruk, Geortler, Tierney, Wohlfarth, Wong, Bowen, Montgomery, Mollet, Webster, Milliken, Cranston, Freeman, Kitz and Herman. In addition, Kimberlin, co-patentee of the Kimberlin et al. patent, was called as a witness by Frilette et al.

The evidence shows that White attended a Gordon Research conference in June 1955 at which one of the subjects discussed was molecular sieves. Such a sieve is described in Clark Exhibit 1, a report by White dated July 13, 1955, as "a zeolite structure from which the water of hydration has been removed; $NA_{12}(AlO_2)_{12} \cdot (SiO_2)_{12} \cdot 27 H_2O \cdot$ [sic]." The report states:

Several forms of this structure have been prepared with port diameters ranging from 3.0 to 5.3Å and with port diameters ranging from 10 to 13Å.

As one of the characteristics of "these zeolite structures," the report lists:

6. In the hydrogen exchange form they have catalytic cracking properties.

It appears that Weisz read this report since a notebook entry of his under date of "Aug. 2–Aug. 5" (1955) appearing in Weisz Exhibit 4 refers to "J.R.W. [J. R. White] report on Mol. Sieve talk at Colby."

Other exhibits include Weisz Exhibits 3 and 5. The former is a notebook entry made by Weisz in March of 1956 referring to the filter properties of a "5A port. molec. filter material" and suggesting utilization of its properties for "cracking of n-paraffins to n-paraffins of lower mol. wt. by having the 'filter' particles combined as a mix with a (de) hydrogenation component * * *." Weisz Exhibit 5, a copy of a typewritten "Technical Summary Letter" of August 1955, refers to "molecular sieves, which are calcium alumina silicate crystals, * * made by Linde Air Products Company," and states that the holes in the crystal have a critical size which "admit the normal paraffins and exclude the aromatics, cycloparaffins and iso-paraffins."

Frilette himself began work at Mobil on March 1, 1956, having been hired by Clark to work on "molecular filters" under Weisz, an assignment that was not changed between that date and April of 1957.

Weisz Exhibit 7, a report by Weisz to Clark dated "April 1956" and entitled "Operations Summary—P.B.W." in-

cludes, under the heading "4. New Catalytic Processes (Frilette)," the statement:

a. Have base exchanged some 4Å and 10Å filter bases to get H in and alkali metal out, to get AA-activity. AA checks made (10Å material shows AA~20, 4Å none, in agreement with expect since cumene size > 4Å!) Scheduling decene runs on such materials.

It appears that this referred to work by Frilette or some other subordinate of Weisz since Weisz did not testify that he performed any of the experiments himself.

Frilette testified that Weisz and he had frequent discussions concerning research work he performed beginning in March 1956. As to an early discussion, he stated:

I recall that in Mr. Weisz' office he had some bottles of molecular sieves sitting on top of a file cabinet, which I believe was located opposite the door and to the left-hand side of the room. The desks were on the opposite side of the room, and it seems to me I was not there more than a day or so before we had these bottles down and were looking at them and talking about them.

He further testified:

X–Q. 600. Do you remember what you said to Mr. Weisz about them, or what Mr. Weisz said to you about them?

A. Not specifically, no.

X–Q. 601. Do you recall in general what you said to Mr. Weisz or what Mr. Weisz said to you about them.

A. In general, we spoke about the possibility of utilizing these particular rather exotic crystalline structures as catalysts and catalyst supports.

X–Q. 602. Do you recall what specific molecular sieves were in those bottles?

A. I can make a guess, if you permit me to refresh my recollection from the records.

X–Q. 603. What would you like to use for the purpose—

A. Well, the first page of the notebook 4856.

X–Q. 604. Please do so.

A. I believe those bottles contained small quantities of Linde 4A powder, 13X—and 13X powder. There may have been others, but these two I am quite sure were there.

With the aid of aforementioned notebook 4856, which covered a period extending from March 1, 1956 through April of 1957, Frilette testified concerning his activities during that time. Included were notes on tests involving molecular sieves designated Linde 4A, Linde 13X and Linde 5A.[7] Other testimony and exhibits related to tests made for Frilette by Lago. Mower, who was assigned to work for Frilette beginning prior to the fall of 1956 testified concerning work he did. The latter included tests on material designated Linde 10X and 13X which took place after February 5, 1957.

Lago testified he received a sample of designated Linde molecular sieve 13X from Frilette on March 9, 1956 to be tested for cracking activity with cumene by the AA or "acid activity" test.[8] As noted in the Frilette et al. main brief, and apparently also in their brief before the board, the results Lago obtained in the test on this untreated material were negative.

7. Frilette testified that the 4A, 5A and 13X sieves were "purported" to have pore sizes of 4, 5 and 13 Angstroms, respectively.

8. The AA test was a standard one involving passing cumene (isopropyl benzene) over the tested material at an elevated temperature and determining the rate of production of propylene as a measure of "acid activity."

According to his evidence, Frilette, on March 12, 1956, treated Linde 13X material with ten times the amount of ammonium ion theoretically necessary for complete exchange with the object of exchanging as much of the sodium therein as possible and replacing it with ammonium. He stated that he then calcined the exchanged material with the expectation of converting the major portion of the ammonium to hydrogen to introduce catalytic activity. According to the evidence, the ammonium exchanged and calcined 13X sieve material was submitted to Lago for a cumene cracking or AA test. Lago stated that he carried out such a test of what he designated "Linde Molecular Sieve 13X calcined ammonium exchange" on March 16, 1956, reporting an acid activity of approximately $20.7 \times 10^{-6}$ moles per second per gram.

A portion of ammonium exchanged and calcined 13X material was submitted for sodium analysis on March 14, 1956. An analysis, carried out by Tierney on March 23, 1956, showed that 6.1% of sodium remained in the treated material. Frilette said that he appeared to have received that analysis by the March 23 date.

Frilette's evidence also shows that he subsequently "exchanged 1/1" (contacted with a solution which contained sodium and ammonium ions in a 1 to 1 ratio) Linde 13X material which was then calcined. Further according to the notebook, that material was employed by Frilette in dodecene cracking on April 30, 1956 with results designated as "34.5% conversion."

Certain tests on Linde 10X material were reported in 1957 after the Kimberlin et al. filing date. One was an AA test on "Linde 10X treated $NH_4NO_3$ calcined 800–6 hours" run by Milliken on March 14, 1957, which reported an AA activity of $43.6 \times 10^{-6}$ mole/second/gram.

### The Board's Decision

The board ruled that neither Lago's March 1956 AA tests on treated material designated as 13X nor Frilette's dodecene cracking test with 1/1 exchanged material in April 1956 established reduction to practice of the subject matter of count 1 "because of lack of corroboration." It stated:

Frilette *et al.* have not offered independent proof of the identity of the untreated materials tested as catalysts in the AA tests. Only Frilette and his co-inventor Weisz had knowledge of the identity of the solid materials used in the AA tests. Count 1 further requires that the metallic aluminosilicate be crystalline but there is no independent proof that such is the case. The Frilette *et al.* reply brief, page 17, states that the material used by Frilette was inherently crystalline. However, we have no independent evidence as to what this material was, nor what its state was after the ammonium treatment. That the inventors' (Frilett's) own records refer to Linde Molecular Sieve 13X and that Frilette was in contact (from his own record, Frilette Exhibit 4) with a Linde employee and that said material is a stable [sic: staple] article of commerce does not corroborate identification of this material which was used in the AA tests. No witness other than Frilette testifies of his own knowledge as to the alleged ammonium treatment of the 13X molecular sieve performed by Frilette. This is fatal to the Frilette *et al.* case for reduction to practice. Vandenberg v. Reynolds, 46 CCPA 938, 268 F.(2d) 744, 122 USPQ 381. The mention of these materials in Frilette's laboratory notebook alone is not sufficient to establish corroboration. Reed v. Cislak and Wheeler, 36 CCPA 1117, 175 F. (2d) 972, 82 USPQ 215; Senkus v. Johnson, [Johnston] 35 CCPA 1008, 166 F.(2d) 597, 77 USPQ 113; Teter v. Kearby, 36 CCPA 706, 169 F.(2d) 808, 79 USPQ 65.

Lago's performance of the AA tests did not corroborate the identity of the solid material that he used. What Lago knew about it was only acquired from the labels on the bottles, thus (Q 49, R. 322)

"I had no way of knowing what the samples were or what was done to them, and as a result of them coming from outside our group I wrote down everything that was on the label to make sure that the sample and the data sheet would be identified."

It was further held by the board that Frilette et al. had not established prior conception of count 1 and had not shown conception followed by diligence to any subsequent reduction to practice.

With regard to count 2, the board held that Frilette et al. have failed to prove conception prior to the Kimberlin et al. filing date or diligence from immediately prior to that date to a subsequent actual reduction to practice. It found that conception of the count was not inherent in the work reported done in 1956 and early 1957 on *sodium* aluminosilicates (as 4A and 13X sieves) which do not comprise an alkaline earth metal or on 5A sieves which, although in calcium or alkaline earth metal form, do not have a pore size between about 6 and about 15 Angstrom units. It also was of the opinion that the *investigations of aluminosilicates* which did take place during the period beginning just prior to the Kimberlin et al. effective date did not establish diligence with respect to the process of count 2. As to the tests on Linde 10X material (calcium form) by Mower and Milliken after the February 5, 1957 date, the board held that there was "no proper identification of the material tested."

### Opinion

We agree with the board's conclusion that Frilette et al. have not proved that they reduced the invention of count 1 to practice prior to the February 5, 1957 filing date of Kimberlin et al. Also, we find that Frilette et al. have not proved diligence as to count 1 extending from a conception prior to that date to a subsequent reduction to practice. As to count 2, we agree with the board that neither prior conception nor diligence extending from a date prior to February 5, 1957 to a subsequent reduction to practice has been proved. For these reasons,

we do not find reversible error in the board's award of priority to Kimberlin et al. and hold that the decision below must be affirmed.

The activities relied on by Frilette et al. for reduction to practice of count 1 are Lago's AA test on treated material in March of 1956 and Frilette's dodecene cracking test on similar material in April of the same year. In order for those tests to amount to reductions to practice, the material tested must be established as a "crystalline metallic alluminosilicate catalyst having uniform pore openings between about 6 and about 15 Angstrom units." In holding that such identity was not established, the board found a "lack of corroboration" and emphasized the deficiency of the evidence as to "what this material was" and "what its state was after the ammonium treatment." Kimberlin et al. argue that not only is there a lack of corroboration but there is a total lack of any probative evidence of the properties of the materials allegedly used. We note that the board seems to have used the terms "lack of corroboration" and "no proper identification of the material tested" interchangeably and agree that the question is broader than mere corroboration and is better defined as whether the record as a whole establishes that the material defined by the count was used in the critical experiments.

Neither Frilette nor any other witness offered any testimony that showed how they obtained the starting material which Frilette denominated Linde 13X molecular sieve. What Frilette stated was that "in Mr. Weisz's office he had some bottles of molecular sieves sitting on top of a file cabinet" and that he believed that those bottles contained "Linde 4A powder" and "13X powder." Apparently, those bottles were the source of the molecular sieve material used in the March and April tests for Frilette testified that "to the best of * * * [his] recollection" he got 4A sieve for certain tests from them and no other source was disclosed for the 13X material. Although Weisz testified, he did not state how or when the bottles and their contents were

obtained, whether the bottles were sealed or unsealed and how and by whom they might have been labeled. Neither did Frilette nor anyone else. Frilette himself, who had no specific catalyst experience and no experience in the field of aluminosilicate catalysts prior to entering Mobil's employment on March 1, 1956, did not point out how he might have recognized that the materials in the bottles were what he said he believed them to be or that any labels that might have been on the bottles were correct. In stating that Weisz and he had discussed the use of the materials "as catalysts and catalyst supports," Frilette characterized them as "rather exotic" materials.

In their briefs, Frilette et al. repeatedly refer to the crystalline metallic aluminosilicate materials as "staple" articles of commerce. However, they point to no evidence that proves the 13X sieve had such status as early as March and April of 1956. Thus, they assert that the materials were, "prior to the time of the filing of Kimberlin et al's. application (February 5, 1957), staple articles of commerce supplied by the Linde Division of Union Carbide Corporation," with the only matter pointed out as supporting evidence being an undated brochure of Linde supplied by Kimberlin et al. in connection with a Rule 131 affidvait in their application for reissue of their involved patent. Assuming but not deciding that that brochure, which relates to physical properties of 4A, 5A and 13X sieves, is properly part of the interference record, it nevertheless does not substantiate the case for Frilette et al. The earliest date which the affidavit could be regarded as attributing to the brochure is "prior to December 14, 1956," the date of the reference being antedated. The fact that the sieves referred to might have been offered as having certain properties at that time does not establish that products existing under a similar designation as early as March of 1956, when the bottles turned up in Weisz's office, either had or were known to have the same properties. Likewise, the properties at that time are not established by other matter cited elsewhere by Frilette

et al. Thus, Weisz Exhibit 5 mentions no sieve number or pore size and Frilette et al. cross Exhibit 7, their patent No. 3,140,322, speaks only as of its August 14, 1958 filing date.

Although Frilette et al. refer to Frilette having "frequent communication in 1956–1957" with a sales representative of Linde, the evidence on this point plainly does not establish the significant properties of 13X sieves as of March 1956. Not only is there no indication that any information concerning crystallinity and pore size was received but an entry regarding a conversation in September of 1956 refers to "faulty 4A or 5A," indicating that difficulties may have been encountered in Linde's sieve preparation.

The record further fails to show that Frilette et al. conducted tests that demonstrated that the 13X material in the ammonium exchanged and calcined form used in the experiments relied on for reduction to practice of count 1 had the pore characteristics—size and uniformity —and the crystallinity required by that count. The record shows some analyses for sodium, aluminum and silicon dioxide both on untreated and on exchanged and calcined samples but it is not pointed out how those results identify the materials as to crystallinity and pore size. X-ray tests on 4A materials showed a difference between the untreated form and the exchanged and calcined form, which difference was attributed to some loss of crytallinity or a decrease in pore size in the latter product. Such evidence that ammonium-exchange and calcination of aluminosilicate products resulted in change in structure indicates that tests were in order to determine whether similar treatment of 13X material had affected its structure relative to crystallinity or pore dimensions. While some measure of pore size of 4A sieves was obtained by "selective sorption measurement," no tests demonstrating the pore size of the 13X sieve material were reported. Even if the record were adequate to show that *untreated* Linde 13X sieves on the market by March 1956 had the required crystallinity and uniform pore size, which we do not think it is, the failure

to disclose how and when the bottles of material on Weisz's cabinet were acquired and the absence of tests or other evidence showing that the *ammonium treated and calcined* 13X sieves tested for catalyst activity in the experiments relied upon had the required properties would leave a serious question whether the latter material complied with the count requirements.

Of course, the designation of the material involved in the March 1956 AA tests in Lago's records as "Linde Molecular Sieve 13X calcined ammonium exchange" cannot establish identification since that designation was merely copied by Lago from the label on the bottle in which the sample was given to him by Frilette and was not based on either knowledge or analysis by Lago.

The experiment involving cracking of dodecene on an ammonium-exchange Linde 13X sieve in April of 1956 suffers from the further disability that the experiment itself, as well as the preparation of the material, was the work of Frilette himself. Regarding that experiment, Frilette et al. "hasten to point out" that Weisz Exhibit 7, the report apparently made by Weisz to his superior Dr. Clark in April 1956, "mentions the fact that Dr. Frilette was scheduling dodecene runs on 10 Angstrom unit materials." However, the report fails to conform to the experiment for two reasons. First the report is incorrectly described and actually refers to "decene" rather than dodecene which was used in the experiment. Also the experiment is purported to be on material designated 13X and not on "10 Angstrom unit materials". Particularly in view of these inconsistencies, the report appears to lack any probative value as circumstantial evidence in corroboration of the Frilette experiment.

■ For the above reasons, we hold that the tests advanced by Frilette et al. fail as reductions to practice for lack of substantial evidence to show that the materials tested were *crystalline* metallic aluminosilicate catalysts having *uniform* pore openings *between about 6 and about 15 Angstrom units*. Since Frilette et al. do not urge before us that they should prevail on the basis of conception of count 1 coupled with diligence extending from just before February 5, 1957 until a subsequent reduction to practice, we need not review the board's holding that no prior conception of that count was shown. We observe, however, that the evidence is obviously insufficient to prove the necessary diligence over the critical period beginning just prior to February 5, 1957 even if prior conception were to be assumed.

As to count 2, Frilette et al. do not assert a reduction to practice prior to the Kimberlin et al. filing date of February 5, 1957 but claim prior conception coupled with diligence extending to a subsequent actual reduction to practice. Concerning the requirement in that count that the catalyst be an *alkaline earth metal* aluminosilicate, Frilette et al. state that "Linde molecular sieve 5A, being a calcium aluminosilicate, is such a material; but Linde molecular sieve 13X, being a sodium aluminosilicate, is not." They further state that sieve 5A has uniform pore openings of 5 Angstrom units. Concerning conception, they then urge:

[1]n view of the fact that the record amply shows that they were extremely familiar with alkaline earth aluminosilicates, having worked with Linde molecular sieve 5A for almost the entire period from May of 1956 until the end of 1956 (as shown by Frilette Exh. 1) and further in view of the fact that Frilette and Weisz were quite familiar during that time with crystalline aluminosilicates generally, including those having a pore size of 6 to 15 Angstrom units, the conception of using a crystalline *alkaline earth metal* aluminosilicate *as the catalyst for the process of Count 1* (and hence a conception of Count 2) is implicit in the vast amount of experimental work carried out in 1956.

In particular, Frilette et al. refer to Frilette's work with cumene and dode-

cene on Linde molecular sieve 13X during March and April of 1956 being followed by work on May 7, 1956 with "Linde 5A pellets clay-bonded" and on May 8, 1956 with "Linde 5A powder pelletized." They also refer to further work in July and September of 1956 with the 5A sieve. Reliance is also placed on Weisz Exhibits 3 and 5. The former is relied on for its reference to the filter properties of a "5A port. molec. filter" and suggestion of utilization of these properties for "cracking of n-paraffins to n-paraffins of lower mol. wt. by having the 'filter' particles combined as a mix with a (de) hydrogenation component * * *." In Weisz Exhibit 5, they depend upon the reference to "molecular sieves, which are calcium alumina silicate crystals," made by Linde Air Products Company and the statement that holes in the crystal have a critical size which admits the normal paraffins and excludes the aromatics, cycloparaffins and isoparaffins.

Frilette et al. assert that the above items reveal the concept of the use of a crystalline alkaline earth metal aluminosilicate, the 5A sieve, to permit a portion of a feed mixture to enter the pores of the material and undergo a cracking reaction therein, while a portion of the feed is excluded. They further contend that one having that concept "[o]bviously" would know that a molecular sieve the same as the first but having larger pores would permit at least as much of the feed to contact the catalytic sites within the pores. They urge in conclusion:

> Therefore, the conception of cracking a feed material with a crystalline alkaline earth aluminosilicate having a 5 Angstrom pore opening is also a conception of cracking a feed material with a crystalline alkaline earth aluminosilicate having a 6 Angstrom pore opening.

However, we think it plain that the reference to and tests with 5A sieve do not show conception of count 2. Instead, the record fully supports the interpretation of the term between "about 6 and about 15" in the count as excluding

materials having pore openings of 5 Angstroms. Thus, the Kimberlin et al. patent, in which both counts originated, emphasizes the use of crystals having a pore size of "about 6" to 15 Angstroms throughout and points out specifically that openings in that range "allow for easy ingress of all hydrocarbon feed types and egress of the reaction products." It also states that such size "serves to lower catalytic coke buildup within the structure and improve regeneration characteristics of the catalyst." The patent further states that the versatility and usage of "3 to 5A pore diameter crystals" are restricted because the crystals will not allow any but straight chain paraffins and olefins to enter the interior of the pores. Also, the patent points out that the 3 to 5 Angstrom pore diameter crystals are of limited use as catalytic agents because they yield relatively large amounts of catalytic coke. The fact, pointed out by Frilette et al., that the Kimberlin et al. patent describes the preparation of a material having pore openings of 5 Angstrom units does not support their position here because the patent shows by test results that the 5 Angstrom material provided results decidedly inferior to material having pore sizes within the about 6 to 15 Angstrom range.

Finally, a motion in which Frilette et al. sought to substitute for count 1 a proposed count in which the lower limit of the pore openings in the crystalline metallic aluminosilicate was defined as "about 5" Angstroms instead of "about 6" Angstroms was denied by the examiner who found that the use of a material with 5 Angstrom pore openings was not included in the invention of the patent claim constituting count 1.

So far as Weisz Exhibits 3 and 5 are concerned, they emphasize the property of the 5A material referred to therein as a *filter* and *sieve*. Since material having pore openings of from about 6 to about 15 Angstroms would not have the same filter characteristics as the 5 Angstrom unit, those exhibits do not demon-

strate conception of the use of materials in the larger size range as the "sole conversion catalysts" in the process of count 2.

Since Frilette et al. have not proved conception of the subject matter of count 2 prior to the Kimberlin et al. filing date, the matter of whether they proved a subsequent actual reduction to practice using Linde 10X in March and April of 1957 is moot.

Remaining for consideration are certain decisions cited by Frilette et al. but deemed too remote from the present situation factually to merit any comments earlier. One of these is Hasselstrom v. McKusick, 324 F.2d 1013, 51 CCPA 1008, (1963), apparently cited for the propositions that "the amount and quality of corroborative evidence that is necessary in any given case will vary with the facts of that case" and that there is "no fixed formula in determining the sufficiency of corroborative evidence." Those principles are sound and have been kept at the forefront in our consideration here but we think it plain that they do not indicate that a reversal is in order.

Patterson v. Hauck, 341 F.2d 131, 52 CCPA 987 (1965), involved the identification of materials used by an inventor in tests of a process. The materials purported to have been used were "exactly the same polyester resins and the same catalysts already in use and being made and sold by * * * [the inventor's employer] prior to the making of the invention as a regular part of its.business." Also, the experiments in question were done as the result of instructions of the inventor's supervisor to use those very materials. That situation contrasts markedly with the present case where the 13X starting material was a "rather exotic" material not made by Mobil or used previously by it for upgrading hydrocarbons, the manner in which Mobil obtained the material is unexplained and the material under the designation applied to it was not shown to have attained the status of a staple product known to have the particular characteristics required by the counts at the critical time.

Mann v. Werner, 347 F.2d 636, 52 CCPA 1578, (1965) is another case involving identification of materials which presents a far stronger evidentiary case than exists here. The question was whether polybutadiene was one of the materials used by associates of the inventor in carrying out certain operations relied on as reduction to practice. In evidence was an order requesting that a service group within the assignee's company produce a polybutadiene latex for use in preparing the compositions of the counts. Also, the operator who made the polybutadiene testified that he got butadiene for the preparation from a tank marked "Butadiene" in which it was normally kept and that he recognized the smell of butadiene. The court, further observing that the procedure used to prepare the polybutadiene was a well-recognized one and that the material was not "so exotic or unusual" that the person who requested it would have been unreasonable in expecting to receive what he ordered, concluded that the proof that the material was polybutadiene was sufficient.

Also cited by Frilette et al. is Ritter v. Rohm and Haas Co., 271 F.Supp. 313, (S.D.N.Y.1967) wherein a patent in suit was held valid but not infringed. There the court, in awarding the plaintiff the benefit of a conception and reduction to practice prior to his filing date, held the inventor's notebook to be "admissible evidence to show corroboration." It appears that the records were complete and meticulously prepared and were "of uncontested authenticity." Moreover, the court stated in considering reduction to practice that the inventor and another witness testified that "the starting materials and products similar to the resulting products were well-known compounds, that the steps carried out were of a type generally known, that the reaction could therefore be predicted with reasonable accuracy," and that analytical equipment which subsequently became available proved the inventor was right. The factual distinction over the present case, where neither the source material

nor the corresponding treated material used in the experiments relied on for reduction to practice was established as having the properties required by the count, is apparent.

The decision is affirmed.

Affirmed.